Kyle Tognan, Esq. (NJ Bar No. 128372014)
**BATHGATE, WEGENER & WOLF, P.C.**
**One Airport Road**
**P.O. Box 2043**
**Lakewood, New Jersey 08701**
**Phone: 732-363-0666**
*Counsel for Plaintiffs*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

### Case No. _____

| | |
|---|---|
| MAHASE RAMNAUTH, LISA N. DEOSINGH, and KUNGBIHARI RAMKISSOON, on behalf of themselves and all others similarly situated, | |
| Plaintiffs, | |
| | **CLASS ACTION** |
| v. | **JURY DEMAND** |
| FREEDOM MORTGAGE CORPORATION, and AMERICAN SECURITY INSURANCE COMPANY, | |
| Defendants. | |

_____/

### CLASS ACTION COMPLAINT

Plaintiffs Mahase Ramnauth, Lisa N. Deosingh, and Kungbihari Ramkissoon file this class action complaint on behalf of themselves and all others similarly situated against FREEDOM MORTGAGE CORPORATION ("Freedom") and AMERICAN SECURITY INSURANCE COMPANY ("ASIC").

### INTRODUCTION

1.      Undersigned Counsel have been litigating force-placed insurance ("FPI") class actions against insurance company Assurant and its subsidiaries (here, Defendant ASIC) for more than seven years in the Southern District of Florida and District of New Jersey. These FPI

cases have been the subject of two different Multi District Litigation Panel ("MDL") hearings and have included engaging in discovery of millions of pages and conducting hundreds of depositions. In early 2011, Undersigned Counsel filed the first of this wave of FPI cases in the Southern District of Florida, *Williams v. Wells Fargo Bank, N.A.,* No. 11-cv-21233-RNS (S.D. Fla.). The *Williams* case was certified and eventually settled and was granted final approval on September 11, 2013.

2.    Undersigned Counsel subsequently filed twenty-two additional nationwide class actions in the Southern District of Florida and in the District of New Jersey against most of the major mortgage lenders and servicers and their partner insurers. Most of these cases were very actively litigated and Undersigned Counsel have now reached nationwide settlements in most of those cases, certifying nationwide classes and providing more than $5.2 billion in monetary relief to over 4.7 million homeowners across the country, plus important injunctive relief which has helped to put an end to most of the alleged unlawful practices for at least five years.[1] This case is brought mainly to recoup monetary damages that were suffered by the customers of mortgage lender and servicer Freedom which worked exclusively with Assurant's subsidiary ASIC to

---

1 *See Williams v. Wells Fargo Bank,* N.A., No. 11-cv-21233 (S.D. Fla.); *Saccoccio v. JPMorgan Chase Bank N.A.,* No. 13-cv-21107 (S.D. Fla.); *Diaz v. HSBC Bank (USA), N.A.,* No. 13-cv-21104 (S.D. Fla.); *Fladell v. Wells Fargo Bank, N.A.,* No. 13-cv-60721 (S.D. Fla.); *Hamilton v. SunTrust Mortg., Inc.,* No. 13-cv-60749 (S.D. Fla.); *Hall v. Bank of Am., N.A.,* No. 12-cv-22700 (S.D. Fla.); *Lee v. Ocwen Loan Servicing, LLC,* No. 14-cv-60649 (S.D. Fla.); *Braynen v. Nationstar Mortg., LLC,* No. 14-cv-20726 (S.D. Fla.); *Wilson v. Everbank, N.A.,* No. 14-cv-22264 (S.D. Fla.); *Montoya v. PNC Bank, N.A.,* No. 14-cv-20474 (S.D. Fla.); *Almanzar v. Select Portfolio Servicing,* No. 14-cv-22586 (S.D. Fla.); *Jackson v. U.S. Bank, N.A.,* No. 14-cv-21252 (S.D. Fla.); *Circeo-Loudon v. Green Tree Servicing, LLC,* No. 14-cv-21384 (S.D. Fla.); *Patel v. Specialized Loan Servicing, LLC,* No. 15-cv-62600 (S.D. Fla.); *Fowler v. Caliber Home Loans, Inc.,* No. 15-cv-24542 (S.D. Fla.); *Beber v. Branch Banking & Trust Co.,* No. 15-cv-23294 (S.D. Fla.); *Ziwczyn v. Regions Bank,* No. 15-cv-24558 (S.D. Fla.); *McNeil v. Selene Finance, LP,* No. 16-cv-22930 (S.D. Fla.); *McNeil v. Loancare, LLC,* No. 16-cv-20830 (S.D. Fla.); *Edwards v. Seterus, Inc.,* No. 15-cv-23107 (S.D. Fla.) *Cooper v. PennyMac Loan Servicing, LLC,* No. 16-cv-20413 (S.D. Fla.).

impose illegal and undisclosed charges to Plaintiffs and the proposed class during the relevant time periods.

**PARTIES**

**Plaintiffs**

3.      Plaintiffs Mahase Ramnauth, Lisa N. Deosingh, and Kungbihari Ramkissoon (the "Ramnauth Plaintiffs" or "Plaintiffs") were charged for FPI by Defendant Freedom. The Ramnauth Plaintiffs are citizens of the State of Florida, residing at 3401 Paris Place, Orlando, Florida 32818. They are natural persons over the age of 21 and are otherwise *sui juris*.

**Defendants**

4.      Defendant AMERICAN SECURITY INSURANCE COMPANY is a Delaware corporation and an indirect subsidiary of Assurant Inc., writing FPI policies in all fifty states and the District of Columbia with its principal address in Atlanta, Georgia. ASIC often operates under the trade name "Assurant Specialty Property." ASIC contracts with the lenders to act as a FPI vendor and take over certain mortgage servicing functions. Its duties include, but are not limited to, tracking loans in their mortgage portfolio, new loan boarding, loss draft functions, escrow analysis, handling customer service duties, and securing FPI policies on properties when a borrower's insurance has lapsed.

5.      Defendant FREEDOM MORTGAGE CORPORATION is a mortgage lender and servicer. Freedom is a New Jersey corporation with its headquarters in Mt. Laurel, New Jersey. Freedom conducts business throughout the United States, including in this District.

## FREEDOM'S HISTORY OF MORTGAGE SERVICING AND MALFEASANCE

6.      With a 154% revenue growth rate over the last 3 years, Freedom is the fifth-largest and one of the fastest growing mortgage servicers in the country.[2] In 2017, Freedom agreed to buy approximately $500 million of selected residential mortgage assets from New York Community Bank's mortgage banking operation. The deal included the right to service over $20 billion of residential mortgage loans.

7.      Freedom's explosive growth has not been without controversy, as Freedom has recently been subjected to scrutiny for its unscrupulous business practices. For instance, in 2016, Freedom was fined $113,000,000 by the Department of Justice to resolve allegations that it knowingly originated and underwrote single-family mortgage loans insured by the United States Department of Housing and Urban Development's Federal Housing Administration that did not meet applicable requirements for the FHA program.[3]

8.      In 2014, Freedom Mortgage was found guilty of violating New Jersey's Consumer Fraud Act in a suit brought against the mortgage lender by Mamie Major, a 70 year old hospital worker, when it issued her a home refinance loan knowing that she would not be able to repay the loan.[4]  In that action, the Court found "that the financial benefit to Freedom in fees for arranging this refinance far exceeded the nominal benefit of savings to" Ms. Major.[5]

---

2  *See*  http://blog.freedommortgage.com/press-releases/freedom-mortgage-named-to-inc-5000-list-of-fastest-growing-companies-for-sixth-consecutive-year

3  *See*  https://www.justice.gov/opa/pr/freedom-mortgage-corporation-agrees-pay-113-million-resolve-alleged-false-claims-act; *see also*  https://www.bloomberg.com/news/features/2018-05-24/small-time-bankers-make-millions-peddling-mortgages-to-the-poor

4        *See*      https://www.housingwire.com/articles/31102-freedom-mortgage-found-guilty-of-defrauding-homeowner

5  https://www.housingwire.com/ext/resources/files/Editorial/Documents/Freedom-Mortgage-v-Major---073114-decision.pdf

9.    In July 2008, Freedom was restricted from issuing Ginnie Mae bonds with loans insured by the Department of Veterans Affairs intermingled with loans from other lenders because Freedom was helping to enable unnecessary refinances of veterans' loans.[6]

10.    Cherry Hill Mortgage Investment Corporation was established by Freedom Mortgage as a mechanism to solicit investors for mortgage servicing rights and mortgage backed securities through Freedom Mortgage. Discovery will reveal the full extent and nature of "CHMI" and any other servicer (or sub-servicer) and their relationship to Freedom's FPI program. The Prospectus discusses Freedom Mortgage's use of sub-servicers and discovery will reveal whether, and to what extent, Freedom took servicing in-house or changed sub-servicers. The CHMI Prospectus also explains that it will reimburse all expenses and that it's Manager is responsible for all costs incident to the performance of its duties under the management agreement, including compensation of our Manager's employees and other related expenses. Discovery will reveal such costs and expenses for all of the servicers relating to the FPI program.

11.    This class action lawsuit seeks to put an end to another such unfair and deceptive practice relating to Freedom's FPI business practices.

## BRIEF FACTUAL BACKGROUND

12.    Freedom has had an arrangement with ASIC and its affiliates for many years whereby ASIC performs many of Freedom's mortgage-servicing functions and is the exclusive provider of FPI coverage for homeowners with mortgage loans owned or serviced by Freedom.

13.    In exchange for providing ASIC with the exclusive right to monitor Freedom's mortgage loan portfolios and force-place its own insurance coverage, ASIC pays Freedom gratuitous kickbacks that are mischaracterized to borrowers as legitimate compensation. These

---

6 *See*   https://www.nationalmortgagenews.com/articles/us-restricts-freedom-mortgage-in-continued-va-loan-crackdown.

kickbacks include, but are not limited to, one or more of the following: (1) unearned "commissions" paid to an affiliate of Freedom for work purportedly performed to procure individual policies; (2) "expense reimbursements" allegedly paid to reimburse Freedom for expenses it incurred in the placement of FPI coverage on homeowners; (3) payments of illusory reinsurance premiums that carry no commensurate transfer of risk; and (4) free or below-cost mortgage-servicing functions that ASIC performs for Freedom. These kickbacks effectively constitute a rebate to Freedom on the cost of the FPI.

14.     Despite representations to borrowers that they will only be charged for the cost of insurance coverage, and provisions in the mortgage contracts binding it to do so, Freedom charges borrowers the cost of coverage plus the amount of the kickbacks; it does not, that is, pass these rebates on to the borrower. Freedom deducts the initial, pre-rebate amount from borrowers' escrow accounts and attempts to disguise the kickbacks as legitimate by mischaracterizing them as income earned by Freedom.

15.     These exclusive and collusive relationships have resulted in extraordinary profits totaling millions of dollars for Freedom and ASIC.[7] While many banks and insurance entities have ceased these practices as a result of class action lawsuits brought nationwide and various state and federal investigations, this class action has been brought to: (1) adequately compensate Freedom homeowners for their economic losses, and (2) enjoin such practices by these Defendants in the future.

16.     Lenders and servicers, like Freedom, force place insurance coverage when a borrower fails to obtain or maintain proper hazard, flood, or wind insurance coverage on the

---

[7] These extraordinary profits are demonstrated by the extremely low loss ratios for the force-placed insurance product – typically in the range of 20-30%. Loss ratios on homeowner's voluntary insurance is typically above 50%.

property that secures his or her loan. Under the typical mortgage agreement, if the insurance policy lapses or provides insufficient coverage, the lender has the right to "force place" new coverage on the property to protect its interest and then charge the borrower the cost of coverage. Freedom's FPI scheme takes advantage of the broad discretion afforded the lenders and servicers in standard form mortgage agreements.

17.     The money to finance FPI schemes comes from unsuspecting borrowers who are charged more than the cost of coverage for FPI by lenders or servicers. Borrowers are required to pay the full amount that the lender or servicer initially pays to the insurer – here ASIC and affiliates – despite the fact that a considerable portion of that amount is kicked back to the lender or servicer in the manner described above. Freedom gets the benefit of an effective rebate from ASIC which it does not pass on to the borrower. Instead, it charges the borrower the full amount, purportedly for the cost of insurance coverage. Lenders and servicers, including Freedom and their exclusive force-placed insurers, reap these unconscionable profits entirely at the expense of the unsuspecting borrowers.

18.     At a hearing on FPI held by the National Association of Insurance Commissioners ("NAIC"), Birny Birnbaum, the foremost expert on the FPI market, illustrated the staggering growth in profits that schemes have reaped in recent years:[8]

---

[8] This graph and the ones that follow were taken from Mr. Birnbaum's presentation to the NAIC on August 9, 2012. The presentation is available at: http://www.naic.org/documents/committees_c_120809_public_shearing_lender_placed_insurance_presentation_birnbaum.pdf.

## LPI Premiums Have Quadrupled Since 2004

| Year | Gross Written Premium ($ Millions) | Net Written Premium ($ Millions) |
|---|---|---|
| 2004 | $1,485 | $796 |
| 2005 | $1,832 | $919 |
| 2006 | $2,163 | $1,074 |
| 2007 | $3,058 | $1,647 |
| 2008 | $4,000 | $2,209 |
| 2009 | $5,181 | $3,049 |
| 2010 | $5,915 | $3,223 |
| 2011 | $5,692 | $3,450 |
| 2004-2011 | $29,326 | $16,368 |

2009-2011 GWP Understated, Reporting Errors by QBE

CEJ LPI Presentation to NAIC                    13                    August 9, 2012

19.     Assurant, Inc. ("Assurant"), which works through its subsidiaries (such as ASIC), is one of the primary insurance companies and controls the majority of the market for FPI. As shown below, Assurant held 58.6% of the nationwide market share for FPI in 2011. Together, Assurant and QBE/Balboa, the other major insurer with a significant market share at that time, controlled 99.7% of the market in the same year, and held no less than 96.1% of the market between 2004 and 2011. Mortgage lenders and servicers sustain the insurers' monopoly by agreeing to purchase all FPI from the two insurers in exchange for kickbacks and other benefits.

**Assurant and QBE Are the Market for LPI:**

**Countrywide Market Share**

| Year | Assurant | QBE/Balboa | Assurant + QBE/Balboa |
|------|----------|------------|-----------------------|
| 2004 | 68.2% | 29.8% | 98.0% |
| 2005 | 69.7% | 26.4% | 96.1% |
| 2006 | 79.2% | 19.5% | 98.7% |
| 2007 | 74.0% | 25.4% | 99.4% |
| 2008 | 74.2% | 25.5% | 99.7% |
| 2009 | 57.2% | 42.4% | 99.7% |
| 2010 | 56.2% | 43.5% | 99.7% |
| 2011 | 58.6% | 41.1% | 99.7% |

CEJ LPI Presentation to NAIC                18                August 9, 2012

20.     In recent years, Defendants' practices have come under increased scrutiny by the government and regulators. For example:

a.   On March 21, 2013, the New York Department of Financial Services' ("NYDFS"), investigation into force-placed insurance practices "produced a major settlement with the country's largest 'force-placed' insurer, Assurant, Inc. . . . [The settlement] includes restitution for homeowners who were harmed, a $14 million penalty paid to the State of New York, and industry-leading reforms that will save homeowners, taxpayers, and investors millions of dollars going forward through lower rates."[9] Further, under the Consent Order entered, Assurant and its subsidiaries (including ASIC) are prohibited from paying commissions to any servicers or entities affiliated with a servicer on FPI policies obtained by the servicer. *See* Assurant & NYDFS Consent Order, Mar. 21, 2013, at 9.

b.   At the NYDFS hearings on May 17, 2012 related to the FPI market, the Superintendent of Financial Services, Benjamin Lawsky, stated that the Department's initial inquiry uncovered "serious concerns and red flags" which included: 1)

---

[9] *See Cuomo Administration Settles with Country's Largest Force-Placed Insurer, Leading Nationwide Reform Effort and Saving Homeowners, Taxpayers, and Investors Millions of Dollars*, Dep't of Fin. Servs., Mar. 21, 2013, *available at,* http://www.dfs.ny.gov/about/press2013/pr1303211.htm.

exponentially higher premiums, 2) extraordinarily low loss ratios, 3) lack of competition in the market, and 4) tight relationships between the banks, their subsidiaries, and insurers. Mr. Lawsky went on to state: "[i]n sum when you combine [the] close and intricate web of relationships between the banks and insurance companies on the one hand, with high premiums, low loss ratios, and lack of competition on the other hand, it raises serious questions[.]"

c. NAIC also held hearings on FPI in August 2012 which included a discussion of "reverse competition" in the FPI market. The NAIC's website explains:

> A key regulatory concern with the growing use of lender-placed insurance is "reverse competition," where the lender chooses the coverage provider and amounts, yet the consumer is obligated to pay the cost of coverage. Reverse competition is a market condition that tends to drive up prices to the consumers, as the lender is not motivated to select the lowest price for coverage since the cost is born by the borrower. Normally competitive forces tend to drive down costs for consumers. However, in this case, the lender is motivated to select coverage from an insurer looking out for the lender's interest rather than the borrower.[10]

d. The Consumer Financial Protection Bureau's new regulations on FPI became final on January 17, 2013. These regulations prohibit servicers of federally regulated mortgage loans from force-placing insurance unless the servicer has a reasonable basis to the believe the borrower's insurance has lapsed and require the servicer to provide three notices of the force-placement in advance of issuing the certificate of insurance.[11]

e. On December 18, 2013, Fannie Mae issued its Servicing Guide Announcement related to FPI that, among other things, prohibits servicers from including any commissions, bonuses, or other incentive compensation in the amounts charged to borrowers for FPI and further requires that the FPI carrier cannot be an affiliated entity of the servicer.[12]

21. Defendants' self-dealing and collusion in the FPI market has caused substantial harm to Plaintiffs and the proposed class they seek to represent. This class action seeks to redress

---

10 *See* http://www.naic.org/cipr_topics/topic_lender_placed_insurance.htm.

11 *See* Consumer Financial Protection Bureau Proposes Rules to Protect Mortgage Borrowers" available at http://www.consumerfinance.gov/pressreleases/consumer-financial-protection-bureau-proposes-rules-to-protect-mortgage-borrowers/

12 *See* https://www.fanniemae.com/content/announcement/svc1327.pdf

that harm on behalf of Plaintiffs and the proposed class members and to recover all improper charges they have incurred related to the forced placement of insurance by Freedom and ASIC.

## JURISDICTION AND VENUE

22.     This Court has jurisdiction over this action pursuant to the Class Action Fairness Act of 2005 ("CAFA"), Pub. L. No. 109-2, 119 Stat. 4 (codified in various sections of 28 U.S.C.).

23.     Plaintiffs are citizens of the State of Florida with property in Florida. Defendants are citizens of various states but are registered to do business in the aforementioned state. The amount in controversy exceeds $5,000,000 and there are at least one hundred members of the putative class.

24.     This Court has jurisdiction over Defendants because Freedom is a New Jersey corporation and ASIC is a foreign corporation authorized to conduct business in New Jersey. Both Defendants are doing business in New Jersey, and have registered with the State of New Jersey, or do sufficient business in New Jersey, have sufficient minimum contacts with New Jersey, or otherwise intentionally avail themselves of the New Jersey consumer market through the promotion, marketing, sale, and service of mortgages or other lending services and insurance policies in New Jersey. This purposeful availment renders the exercise of jurisdiction by this Court over Defendants and their affiliated or related entities permissible under traditional notions of fair play and substantial justice.

25.     In addition, this Court has subject-matter jurisdiction under CAFA because the amount in controversy exceeds $5 million and diversity exists between Plaintiff and the Defendants. 28 U.S.C. § 1332(d)(2). Further, in determining whether the $5 million amount in

controversy requirement of 28 U.S.C. § 1332(d)(2) is met, the claims of the putative class members are aggregated. 28 U.S.C. § 1332(d)(6).

26.     Venue is proper in this forum pursuant to 28 U.S.C. § 1391 because Defendants transact business and may be found in this District. Venue is also proper in this forum because Defendant Freedom is headquartered in New Jersey.

27.     All conditions precedent to this action have been performed, excused, waived or have otherwise occurred.

## FACTUAL ALLEGATIONS

28.     Permitting a lender to forcibly place insurance on a mortgaged property and charge the borrower for the cost of the coverage is neither a new concept nor a term undisclosed to borrowers in mortgage agreements. The standard form mortgage agreements owned or serviced by Freedom include a provision requiring the borrower to maintain hazard insurance coverage, flood insurance coverage if the property is located in a Special Flood Hazard Area as determined by the Federal Emergency Management Agency, and wind insurance coverage on the property securing the loan, and in the event the insurance lapses, permit Freedom to obtain force-placed coverage and charge the borrower for the cost rather than declare the borrow in default.

29.     What is unknown to borrowers and not disclosed in the mortgage agreements is that Freedom has exclusive arrangements with ASIC and its affiliates to manipulate the FPI market and charge borrowers more than permitted by contract for FPI. Freedom pays ASIC premiums for master group policies which cover Freedom's entire portfolio of mortgage loans, and ASIC then kicks back a fixed percentage of the premium amount to Freedom, providing it a rebate on the cost of coverage. The kickbacks—which are entirely gratuitous and unearned—are disguised as "commissions," "qualified expense reimbursements," or ceded reinsurance

premiums, and other unmerited charges. Freedom then charges borrowers the full, pre-rebate amounts, despite covenants in its mortgage agreements and representations in notices mailed to borrowers that they will be charged only the "cost of insurance coverage" for FPI.

### The Force-Placed Insurance Schemes

30.     ASIC has entered into an exclusive arrangement with Freedom to provide various mortgage servicing functions at below cost; mortgage servicing functions that are properly Freedom's responsibilities and that Freedom is paid to perform by the owners of loans. ASIC also contracts to monitor Freedom's mortgage loan portfolios and force-place insurance when an individual borrower's voluntary policy lapses, both obligations properly borne by Freedom. In addition to the subsidized mortgage services Freedom receives from ASIC, a percentage of borrowers' FPI charges are "kicked back" and paid directly to Freedom.

31.      The scheme works as follows. Freedom contracts for ASIC to take over various mortgage servicing functions and for a master insurance policy that covers its entire portfolio of mortgage loans. In exchange, ASIC and its affiliates are given the exclusive right to be the sole FPI provider on property, securing a loan within the portfolio when the borrower's insurance lapses or Freedom determines the borrower's existing insurance is inadequate.

32.     ASIC and its affiliates monitor Freedom's loan portfolios for lapses in borrowers' insurance coverage. Once a lapse is identified, an automated cycle of notices, purporting to come from Freedom but actually generated by ASIC, is sent to the borrowers to inform them that insurance will be purchased and force-placed if the voluntary coverage is not continued. In reality, however, the master policy is already in place and Freedom does not purchase a new policy on the individual borrower's behalf; instead, a certificate of insurance from the master

policy is automatically issued by ASIC. If a lapse continues, the borrower is notified that insurance is being force-placed at his or her expense.

33.     No individualized underwriting ever takes place for the force-placed coverage. Insurance is automatically placed on the property and the inflated amounts, including the unlawful kickbacks, are charged to the borrower. In many instances, the insurance lapse is not discovered for months or even years after the fact. Despite the absence of any claim or damage to the property during the period of lapse, coverage is placed on the property and the borrower is charged for the "cost" of the retroactive coverage.

34.     Freedom then pays ASIC for the certificate of insurance, which issues from the already-existing master policy. Freedom's obligations to pay ASIC for the FPI arise from the agreements between Freedom and ASIC, which govern the mortgage servicing functions that ASIC performs as well as the procurement of the master policy, and are executed and already in place before the borrower's coverage lapses.

35.     Once coverage is issued and Freedom has paid ASIC the full amount invoiced, ASIC kicks back a set percentage of that amount to Freedom without Freedom performing any functions related to the placement of coverage or servicing of the borrower's loan. The kickbacks paid to Freedom or its affiliates are disguised as "commissions," "reinsurance payments," or "expense reimbursements." Upon information and belief, any Freedom affiliate that receives the kickback passes along that payment to Freedom, sometimes in the form of "soft dollar" or other credits.

36.     The payment is not compensation for work performed; rather, it is an effective rebate on the premium amount, reducing the cost of coverage that Freedom pays to ASIC. The "commissions" or "expense reimbursements" are not legitimate reimbursements for actual costs,

nor are they payments that have been earned for any work done by Freedom or its affiliates related to the placement of the insurance; instead, they are unlawful kickbacks to Freedom for the exclusive arrangement to force-place insurance.

37.    The money paid back to Freedom and its affiliates is not given in exchange for any services provided by them; it is simply grease paid to keep the force-placed machine moving. In an attempt to mask the kickbacks as legitimate, ASIC, in letters purporting to come from Freedom, will often disclose to the borrower that Freedom or its affiliates may earn commissions or compensation as a result of the forced placement of new coverage. In reality, however, no work is ever done by Freedom or its affiliates to procure insurance for that particular borrower because the coverage comes through the master policy already in place – and the process is largely automated by ASIC. As a result, no commission or compensation is "earned" and, in addition, neither Freedom nor its affiliates incur any costs in relation to force-placing insurance on any particular borrower and therefore no "expense reimbursement" is due.

38.    Once the certificate of insurance is issued on an individual borrower, Freedom then charges that borrower the full, "pre-rebate" amount for the coverage while purporting to charge the borrower the cost of the insurance coverage in keeping with the borrower's mortgage agreement. The inflated amount is either deducted from the borrower's mortgage escrow account or added to the balance of the borrower's loan.[13] The borrower's escrow account is depleted irrespective of whether other escrow charges, such as property taxes, are also due and owing.

39.    Under this highly profitable FPI scheme, Freedom is incentivized to purchase and force-place insurance coverage with artificially inflated premiums on a borrower's property because the higher the cost of the insurance policy, the higher the kickback. And, as a result of

---

[13] On some occasions, when a borrower does not have an escrow account, an escrow account with a negative balance is created and the borrower is charged to bring the balance to zero.

the kickbacks, Freedom effectively pays a reduced amount for FPI coverage but does not to pass these savings on to its borrowers.

40.    ASIC and Freedom also enter into agreements for ASIC to provide mortgage servicing activities on Freedom's loan portfolios at below cost. These activities include, but are not limited to, services such as new loan boarding, escrow administration, and loss draft functions – many of which have little or nothing to do with FPI. ASIC offers to take on these mortgage servicing functions – which are Freedom's responsibilities pursuant to its agreements with the owners of the loans – at a discount to maintain its exclusive right to force-place insurance on Freedom borrowers. Indeed, ASIC does not perform these services for Freedom without also being the exclusive provider of FPI.

41.    The full cost of the servicing activities is added into the force-placed amounts which are then passed on to the borrower. ASIC and its affiliates are able to provide these services at below cost because of the enormous profits it makes from the hyper-inflated amounts charged for FPI. However, because insurance-lapsed mortgaged property typically comprises only 1–2% of Freedom's total mortgage portfolio, the borrowers who pay the charges unfairly bear the entire cost to service the entire loan portfolio – despite many of the services having nothing to do with FPI. These charges, passed on to Plaintiffs and the proposed Class members, are not properly chargeable to the borrower because they are expenses associated with the servicing of all the loans and Freedom is already compensated for these activities by the owners of the loans (e.g., Fannie Mae).

42.    The small percentage of borrowers who are charged for FPI shoulder the costs of monitoring Freedom's loan portfolios, effectively resulting in a kickback.

43.     In addition, upon information and belief, ASIC enters into essentially riskless "captive reinsurance arrangements" with affiliates of Freedom to "reinsure" the property insurance force-placed on borrowers. A 2012 *American Banker* article illustrated this reinsurance problem using JPMorgan Chase's program by way of example:

> JPMorgan and other mortgage servicers reinsure the property insurance they buy on behalf of mortgage borrowers who have stopped paying for their own coverage. In JPMorgan's case, 75% of the total force-placed premiums cycle back to the bank through a reinsurance affiliate. This has raised further questions about the force-placed market's arrangements. . . .

> Over the last five years, Chase has received $660 million in reinsurance payments and commissions on force-placed policies, according to New York's DFS. . . .

> Of every hundred dollars in premiums that JPMorgan Chase borrowers pay to Assurant, the bank ends up keeping $58 in profit, DFS staff asserted. The agency suggested the bank's stake in force-placed insurance may encourage it to accept unjustifiably high prices by Assurant and to avoid filing claims on behalf of borrowers, since that would lower its reinsurer's returns.

> The DFS staff also questioned the lack of competition in the industry, noting that Assurant and QBE have undertaken acquisitions that give them long-term control of 90% of the market. Further limiting competition are the companies' tendency to file identical rates in many states, Lawsky and his staff argue.

J. Horwitz, *Chase Reinsurance Deals Draw New York Regulator's Attacks*, AM. BANKER, May 18, 2012, *available at* http://www.americanbanker.com/issues/177_97/chase-reinsurance-deals-regulator-attack-1049460-1.html.

44.     Freedom's reinsurance programs are simply a way to funnel profits, in the form of ceded premiums, to Freedom at borrowers' expense. While reinsurance can, and often does, serve a legitimate purpose, here it does not. On information and belief, Freedom or its affiliates enter into reinsurance agreements with ASIC that provide that ASIC will return to Freedom significant percentages of the FPI charges by way of ceded reinsurance premiums to Freedom's affiliates or subsidiaries – which in turn pass on these profits to Freedom. The ceded premiums

are nothing more than a kickback to Freedom and a method for Freedom to profit from the forced placement of new coverage. Indeed, while Freedom or its affiliates purportedly provided reinsurance, it did not assume any real risk.

45.     The amounts charged borrowers are also inflated by the interest that accrues on the amounts owed for force-placed coverage; when Freedom adds charges for FPI to a homeowners' mortgage loan balances, it increases the interest paid over the life of the loan by the homeowners to the lenders or servicers.

46.     The actions and practices described above are unconscionable and undertaken in bad faith with the sole objective to maximize profits. Borrowers who for whatever reason have stopped paying for insurance or are under-insured on mortgaged property are charged more than Freedom's cost of coverage FPI. These charges cover undisclosed kickbacks to Freedom or its affiliates (who, as described above, perform little to no functions related to the force-placement of the individual policies), as well as the cost of captive reinsurance arrangements, and discounted mortgage servicing functions.

47.     Borrowers have no say in the selection of the FPI carrier or the terms of the FPI policies. FPI policies are commercial insurance policies with premiums intended for all lender or servicer clients of ASIC and are meant to protect their interest in the property.[14] The terms are determined by the lender or servicer and the insurers.

48.     Plaintiffs here do not challenge Freedom's right to force place insurance in the first instance. They challenge Defendants' manipulation of the FPI market with an eye toward charging borrowers more for FPI than is authorized by their mortgage contracts, using unlawful kickback arrangements to cast the illegitimate excess charges as costs related to procuring

---

[14] Indeed, ASIC's master insurance policy is entitled "Mortgagee Interest Protection."

coverage. Lenders or servicers, like Freedom, are financially motivated to select the insurer, like ASIC, that offers them the best financial benefit in the terms of "commissions," "expense reimbursements," discounted mortgage servicing functions, or ceded reinsurance premiums.

49.     This action is brought to put an end to Defendants' exclusive, collusive, and uncompetitive arrangements. Plaintiffs seek to recover the improper charges passed on to them and other borrowers nationwide through their claims for breach of contract, breach of the implied covenant of good faith and fair dealing, unjust enrichment, tortious interference with a contract or advantageous business relationship, and violations of the federal Truth in Lending Act ("TILA"), and Racketeer Influenced and Corrupt Organizations Act ("RICO"), and New Jersey's consumer protection statutes.

### Plaintiffs Mahase Ramnauth, Lisa N. Deosingh, and Kungbihari Ramkissoon

50.     Plaintiffs Mahase Ramnauth, Lisa N. Deosingh, and Kungbihari Ramkissoon took a mortgage loan on a property in Orlando, Florida. Freedom was responsible for servicing their mortgage loan at all times relevant to the allegations herein.

51.     Freedom forced hazard coverage through ASIC on the Ramnauth Plaintiffs' property for the periods including but not limited to, August 8, 2014 through August 8, 2015, and January 23, 2018 through January 23, 2019.  Upon information and belief, additional placements also occurred.

52.     The Ramnauth Plaintiffs received notices from ASIC on Freedom letterhead advising that their coverage had lapsed and that new coverage would be forced if the lapse was not cured. The notices represented that the amounts charged for coverage covered the "cost of hazard insurance," but did not disclose that the Ramnauth Plaintiffs would be charged more than Freedom's cost of insurance coverage.

53.     At no time did any Defendants disclose, by any means, to the Ramnauth Plaintiffs that an exclusive relationship between Freedom and ASIC was already in place. Nor was there any disclosure of the financial arrangement between the Defendants to keep the exclusive force-placed relationship in place.

54.     Nor was it disclosed to the Ramnauth Plaintiffs or the putative Class members that because of this kickback, Freedom itself would effectively be paying a less than what it would charge to the Ramnauth Plaintiffs for the FPI coverage.

55.     Finally, it was never disclosed to the Ramnauth Plaintiffs or the Class members that the amounts charged to them covered other illegitimate kickbacks and below cost mortgage-servicing functions not properly charged to them. The amounts kicked back to Freedom were not reduced from the amount charged resulting in the Ramnauth Plaintiffs paying more than the "cost" of the insurance.

56.     All putative Class members received materially similar letters pursuant to the automated procedures used by Defendants.

57.     There are no material differences between these Defendants' actions and practices directed to the Ramnauth Plaintiffs and their actions and practices directed to the putative Class.

## CLASS ALLEGATIONS

### A.     Class Definition

58.     Plaintiffs bring this action against Defendants pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of themselves and all other persons similarly situated. Plaintiffs seeks to represent the following class:

> All borrowers within the United States who, within the applicable statutes of limitation, were charged for a force-placed insurance policy through Freedom or its affiliates, entities, or subsidiaries. Excluded from this class are Defendants,

their affiliates, subsidiaries, agents, board members, directors, officers, and/or employees.

59.     Plaintiffs reserve the right to modify or amend the definitions of the proposed class before the Court determines whether certification is appropriate.

60.     Defendants subjected Plaintiffs and the respective Class members to the same unfair, unlawful, and deceptive practices and harmed them in the same manner.

## B.     Numerosity

61.     The proposed class is so numerous that joinder of all members would be impracticable. Defendants sell and service millions of mortgage loans and insurance policies in Florida, New Jersey, and nationwide. The individual Class members are ascertainable, as the names and addresses of all Class members can be identified in the business records maintained by Defendants. The precise number of Class members for the class numbers at least in the thousands and can only be obtained through discovery, but the numbers are clearly more than can be consolidated in one complaint such that it would be impractical for each member to bring suit individually. Plaintiffs do not anticipate any difficulties in the management of the action as a class action.

## C.     Commonality

62.     There are questions of law and fact that are common to Plaintiffs' and Class members' claims. These common questions predominate over any questions that go particularly to any individual member of the Class. Among such common questions of law and fact are the following:

a.   Whether Freedom charged borrowers for unnecessary insurance coverage including, but not limited to, insurance coverage that exceeded the amount required by law or the borrowers' mortgages;

b.  Whether Freedom breached its mortgage contracts with Plaintiffs and the Class members by charging them for FPI that included illegal kickbacks (including unwarranted commissions or qualified expense reimbursements, and reinsurance payments) and by charging Plaintiffs and the Class members for servicing their loans;

c.  Whether Freedom has been unjustly enriched at the expense of Plaintiffs and the Class members;

d.  Whether Freedom breached the implied covenant of good faith and fair dealing by entering into exclusive arrangements with ASIC and/or their affiliates, which resulted in amounts above the cost of coverage for FPI being charged to Plaintiffs and the Class members as kickbacks;

e.  Whether Defendants manipulated FPI purchases in order to maximize their profits to the detriment of Plaintiffs and the Class members;

f.  Whether Freedom, or its affiliates perform any work or services in exchange for the "commissions" or other "compensation" they collect;

g.  Whether "qualified expense reimbursements" received by Freedom are for true expenses or are just kickbacks pursuant to its exclusive relationship with ASIC;

h.  Whether Freedom charges Plaintiffs and the Class members amounts beyond the cost of coverage and take kickbacks from ASIC that are disguised as "commissions" and "qualified expense reimbursements," among other things;

i.  Whether Freedom violated the federal Truth in Lending Act ("TILA") by conditioning its extensions of credit on the purchase of insurance through an affiliate, in direct contravention of the anti-coercion disclosures included in borrowers' mortgages;

j.  Whether Freedom violated TILA by failing to disclose kickbacks charged to Plaintiff and the Class members in their mortgages;

k.  Whether ASIC intentionally and unjustifiably interfered with Plaintiffs' and the Class members' rights under the mortgage contracts by paying kickbacks and providing free or below-cost mortgage servicing functions to Freedom or its affiliates thereby inducing a breach of the contract;

l.  Whether Defendants were associated with the enterprise and agreed and conspired to violate the federal RICO statutes; and

m.  Whether Plaintiffs and the Class members are entitled to damages and/or injunctive relief as a result of Defendants' conduct.

**D.**   **Typicality**

63.   Plaintiffs are members of the Class they seek to represent. Plaintiffs' claims are typical of the Class members' claims because of the similarity, uniformity, and common purpose of the Defendants' unlawful conduct. Each Class member has sustained, and will continue to sustain, damages in the same manner as Plaintiffs as a result of Defendants' wrongful conduct.

**E.**   **Adequacy of Representation**

64.   Plaintiffs are adequate representatives of the class they seek to represent and will fairly and adequately protect the interests of those class. Plaintiffs are committed to the vigorous prosecution of this action and have retained competent counsel, experienced in litigation of this nature, to represent them. There is no hostility between Plaintiffs and the unnamed Class members. Plaintiffs anticipate no difficulty in the management of this litigation as a class action.

65.   To prosecute this case, Plaintiffs have chosen the undersigned law firms, which are very experienced in class action litigation and have the financial and legal resources to meet the substantial costs and legal issues associated with this type of litigation.

**F.**   **Requirements of Fed. R. Civ. P. 23(b)(3)**

66.   The questions of law or fact common to Plaintiffs' and each Class member's claims predominate over any questions of law or fact affecting only individual members of the class. All claims by Plaintiffs and the unnamed Class members are based on Defendants' scheme regarding the FPI policies and their deceptive and egregious actions involved in securing the force-placed policy.

67.   Common issues predominate where, as here, liability can be determined on a class-wide basis, even when there will be some individualized damages determinations.

68.     As a result, when determining whether common questions predominate, courts focus on the liability issue, and if the liability issue is common to the class as is the case at bar, common questions will be held to predominate over individual questions.

**G.     Superiority**

69.     A class action is superior to individual actions in part because of the non-exhaustive factors listed below:

(a)     Joinder of all class members would create extreme hardship and inconvenience for the affected customers as they reside all across the states;

(b)     Individual claims by class members are impractical because the costs to pursue individual claims exceed the value of what any one class member has at stake. As a result, individual class members have no interest in prosecuting and controlling separate actions;

(c)     There are no known individual class members who are interested in individually controlling the prosecution of separate actions;

(d)     The interests of justice will be well served by resolving the common disputes of potential class members in one forum;

(e)     Individual suits would not be cost effective or economically maintainable as individual actions; and

(f)     The action is manageable as a class action.

**H.     Requirements of Fed. R. Civ. P. 23(b)(1) & (2)**

70.     Prosecuting separate actions by or against individual Class members would create a risk of inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the class.

71.     Defendants have acted or failed to act in a manner generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Class as a whole.

## COUNT I

## BREACH OF CONTRACT
### (against Freedom)

72.     The Ramnauth Plaintiffs re-allege and incorporate paragraphs 1–71, above as if fully set forth herein and further allege as follows.

73.     The Ramnauth Plaintiffs and all similarly situated Class members have mortgages that are owned and/or serviced by Freedom.

74.     The Ramnauth Plaintiffs and these Class members' mortgages are written on uniform mortgage forms and contain substantially similar provisions regarding FPI requirements and its placement by Freedom. The force-placed provisions from the Ramnauth Plaintiffs' mortgage are set forth above.

75.     The Ramnauth Plaintiffs' mortgage requires that they maintain insurance on their property and provide that if they fail to do so, then the lender may obtain insurance coverage to protect its interest in the property, "force place" the coverage, and charge the borrower the cost.

76.     Freedom charges borrowers amounts for FPI that include unmerited "qualified expense reimbursements" or "commissions," reinsurance payments, as well as discounted mortgage servicing functions, and other impermissible costs. These costs are not costs of coverage, and are not applied to protecting Freedom's rights or risk in the collateral for borrowers' mortgage loans. Freedom breached the mortgage agreements by, among other things, charging the Ramnauth Plaintiffs and Class members the amounts beyond the actual cost of coverage.

77.     Freedom has also breached Plaintiffs' and the Class members' mortgage agreements by charging the Ramnauth Plaintiffs and the Class members for excess and

unnecessary FPI coverage, as such coverage does not protect Freedom's rights in its collateral or cover its risk.

78.     The Ramnauth Plaintiffs and the Class members have suffered damages as a result of Freedom's breaches of its contracts.

**WHEREFORE**, the Ramnauth Plaintiffs, on behalf of themselves and all similarly situated class members, seek compensatory damages resulting from Freedom's breaches of contract, as well as injunctive relief preventing it from further violating the terms of the Class members' mortgages. The Ramnauth Plaintiffs further seek all relief deemed appropriate by this Court, including pre-and post-judgment interest, attorneys' fees and costs.

## COUNT II

## BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING
### (against Freedom)

79.     The Ramnauth Plaintiffs re-allege and incorporate paragraphs 1–71 above as if fully set forth herein and further allege as follows.

80.     A covenant of good faith and fair dealing is implied in every contract and imposes upon each party a duty of good faith and fair dealing in its performance. Common law calls for substantial compliance with the spirit, not just the letter, of a contract in its performance.

81.     Where an agreement affords one party the power to make a discretionary decision without defined standards, the duty to act in good faith limits that party's ability to act capriciously to contravene the reasonable contractual expectations of the other party.

82.     The Ramnauth Plaintiffs' and the Class members' mortgage contracts allow Freedom to force place insurance coverage on the borrower in the event of a lapse in coverage, but do not define standards for selecting an insurer or procuring an insurance policy.

83.     Freedom is afforded substantial discretion in force-placing insurance coverage. It is permitted to unilaterally choose the company from which it purchases FPI and negotiate any price for the coverage it procures. Freedom has an obligation to exercise the discretion afforded it in good faith, and not capriciously or in bad faith. The Ramnauth Plaintiffs do not seek to vary the express terms of the mortgage contract, but only to insure that Freedom exercises its discretion in good faith.

84.     Freedom breached the implied covenant of good faith and fair dealing by, among other things:

(a)     Manipulating the FPI market by selecting insurers (here, ASIC and its affiliates) that will participate in its kickback scheme, and by failing to seek competitive bids on the open market and instead contracting to create "back room" deals whereby an exclusive arrangement is in place for ASIC to issue its own insurance coverage without Freedom seeking a competitive price;

(b)     Exercising its discretion to choose a force-placed coverage in bad faith and in contravention of the parties' reasonable expectations, by purposefully selecting coverage from insurers that will participate in a scheme to charge borrowers amounts beyond the cost of coverage;

(c)     Assessing inflated and unnecessary insurance charges against the Ramnauth Plaintiffs and the Class and misrepresenting the reason for the cost of the policies;

(d)     Collecting a percentage of the amounts charged to borrowers and not passing that percentage on to the borrower;

(e)     Charging the Ramnauth Plaintiffs and the Class the cost of having the vendor perform its obligation of servicing its mortgage portfolio, which is not properly chargeable to the Ramnauth Plaintiffs or the Class;

(f)     Charging the Ramnauth Plaintiffs and the Class for expense reimbursements or commissions when the insurance is prearranged, no work is done by Freedom or its affiliates, no expenses related to the placement of the force-placed insurance are incurred, and no commission is due; and

(h)     Charging the Ramnauth Plaintiffs and the Class illegitimate amounts for FPI due to the captive reinsurance arrangement.

85.     As a direct, proximate, and legal result of the aforementioned breaches of the covenant of good faith and fair dealing, the Ramnauth Plaintiffs and the Class have suffered damages.

**WHEREFORE**, the Ramnauth Plaintiffs, on behalf of themselves and similarly situated Class members, seek a judicial declaration that the amounts charged and the terms of the FPI policies violate the duties of good faith and fair dealing. The Ramnauth Plaintiffs also seek damages resulting from Freedom's breaches of its duties. The Ramnauth Plaintiffs further seek all relief deemed appropriate by this Court, including pre- and post-judgment interest, attorneys' fees and costs.

## COUNT III

### UNJUST ENRICHMENT
#### (against Freedom)[15]

86.     The Ramnauth Plaintiffs re-allege and incorporate paragraphs 1–71, above as if fully set forth herein and further allege as follows.

87.     Freedom received from the Ramnauth Plaintiffs and Class members, benefits in the form of unwarranted kickbacks, including "expense reimbursements" or "commissions," captive reinsurance arrangements, and subsidized loan servicing costs.

88.     Freedom entered into an agreement whereby the insurance vendor – here, ASIC and its affiliates – would provide below cost mortgage servicing activities and cover Freedom's entire portfolio of loans with a master policy and issue certificates of insurance when a borrower's voluntary policy lapsed. Freedom would then charge the Ramnauth Plaintiffs and the

---

[15] The Ramnauth Plaintiffs plead their unjust enrichment claim against Freedom in the alternative to their contractual claims.

Class amounts for the FPI that had been artificially inflated to include the kickbacks described above and then retain the amounts of those kickbacks for itself. The force-placed policies imposed on borrowers therefore cost less than what Freedom actually paid for them.

89.     ASIC paid and collected significant monies in kickbacks, commissions, reimbursements, and reinsurance tied directly to the cost of the force-placed insurance premium (as a percentage). Commissions or kickbacks were paid directly to Freedom or its affiliates in order to be able to exclusively provide FPI policies. ASIC and its affiliates were mere conduits for the delivery of the kickbacks and improper charges to Freedom or its affiliates.

90.     These payments directly benefitted Freedom and/or its affiliates and were taken to the detriment of the borrower. The kickbacks (in the form of reimbursements, commissions, or reinsurance arrangements, as well as subsidized costs) were subsumed into the charges to borrowers for the force-placed insurance and ultimately paid by them. Therefore, Freedom had the incentive to charge and collect unreasonably inflated prices for the force-placed policies.

91.     Further, Freedom was unjustly enriched through financial benefits in the form of increased interest income and other fees that resulted when the amounts for the force-placed insurance policies were added to the Class members' mortgage loans.

92.     As a result, the Ramnauth Plaintiffs and the Class members have conferred a benefit on Freedom.

93.     Freedom had knowledge of this benefit and voluntarily accepted and retained the benefit conferred on it.

94.     Freedom will be unjustly enriched if it is allowed to retain the aforementioned benefits, and each Class member is entitled to recover the amount by which Freedom was unjustly enriched at his or her expense.

**WHEREFORE**, the Ramnauth Plaintiffs, on behalf of themselves and all similarly situated Class members, demand an award against Freedom in the amounts by which it has been unjustly enriched at the Ramnauth Plaintiffs' and the Class Members' expense, and such other relief as this Court deems just and proper.

### COUNT IV

### TORTIOUS INTERFERENCE WITH A BUSINESS RELATIONSHIP
#### (by the Ramnauth Plaintiffs against ASIC)

95.    The Ramnauth Plaintiffs re-allege and incorporate paragraphs 1–71, above as if fully set forth herein and further allege as follows.

96.    The Ramnauth Plaintiffs and the Class members have advantageous business and contractual relationships with Freedom pursuant to the mortgage contracts. The Ramnauth Plaintiffs and the Class members have legal rights under these mortgage contracts. For example, the Ramnauth Plaintiffs and the Class members have a right not to be charged exorbitant charges in bad faith for forced-place insurance.

97.    ASIC has knowledge of the mortgage contracts and the advantageous business and contractual relationships between the Ramnauth Plaintiffs and the Class members and Freedom. ASIC is not a party to the mortgage contracts, nor is it a third-party beneficiary of the mortgage contracts. Further, ASIC does not have any beneficial or economic interest in the mortgage contracts.

98.    ASIC, in bad faith and with the intent to maximize the Defendants' profits, intentionally and unjustifiably interfered with the Ramnauth Plaintiffs' and the Class's rights under the mortgage contracts, as described above, by, *inter alia*, entering into an exclusive relationship with Freedom and its affiliates, whereby it provided kickbacks (in the form of unmerited expense reimbursements or commissions, or reinsurance premiums without the

corresponding risk, as well as below cost mortgage servicing) to Freedom in exchange for the exclusive right to force-place insurance on borrowers' properties.

99.     The Ramnauth Plaintiffs and the Class members have been damaged as a result of ASIC' interference with their mortgage contracts by being charged unauthorized and illegitimate amounts for FPI in contravention of their rights under the mortgages.

**WHEREFORE**, the Ramnauth Plaintiffs, on behalf of themselves and all Class members similarly situated, seek a judgment in their favor against ASIC for the actual damages suffered by them as a result of ASIC's tortious interference. The Ramnauth Plaintiffs also seek all costs of litigating this action, including attorneys' fees.

## COUNT V

## VIOLATIONS OF THE TRUTH IN LENDING ACT, 15 U.S.C. § 1601, et seq.
### (the Ramnauth Plaintiffs against Freedom)

100.     The Ramnauth Plaintiffs re-allege and incorporate paragraphs 1–71, above as if fully set forth herein and further allege as follows.

101.     The Ramnauth Plaintiffs' and the Class Members' mortgages were consumer credit plans secured by their principal dwellings, and were subject to the disclosure requirements of the Truth in Lending Act ("TILA"), 15 U.S.C. § 1601, *et seq.*, and all related regulations, commentary, and interpretive guidance promulgated by the Federal Reserve Board.

102.     Freedom is a "creditor" as defined by TILA because it owned and/or serviced Plaintiffs' mortgages and changed the terms of the mortgages so as to create a new mortgage obligation, of which Freedom was the creditor.

103.     Pursuant to TILA, Freedom was required to accurately and fully disclose the terms of the legal obligations between the parties. See 12 C.F.R. § 226.17(c).

104.     Freedom violated TILA, specifically 12 C.F.R. § 226.17(c), when it: (i) added FPI charges to the Ramnauth Plaintiffs' mortgage obligations and failed to provide new disclosures; and (ii) failed at all times to disclose the amount and nature of the kickbacks, reinsurance, discount mortgage servicing, and other profiteering involving Freedom and/or its affiliates as a result of the purchase of force-placed insurance.

105.     When Freedom changed the terms of the Ramnauth Plaintiffs' mortgage to allow previously unauthorized kickbacks and insurance amounts in excess of its interests in the property, it changed the finance charge and the total amount of indebtedness, extended new and additional credit through FPI charges, and thus created a new debt obligation. Under TILA, Freedom was then required to provide a new set of disclosures showing the amount of the insurance charges (i.e. finance charges) and all components thereof. On information and belief, Freedom increased the principal amount under the Ramnauth Plaintiffs' mortgage when it force-placed the insurance, which was a new debt obligation for which new disclosures were required.

106.     Freedom adversely changed the terms of the Ramnauth Plaintiffs' loan after origination in order to allow a kickback on the force-placed insurance charges. These kickbacks are not authorized in the mortgage in any clear and unambiguous way. Freedom never disclosed to borrowers the amount of the "commissions," "expense reimbursements," or other unearned profits paid to it or its affiliate.

107.     Freedom also violated TILA by adversely changing the terms of the Ramnauth Plaintiffs' loan after origination by requiring and threatening to force-place more insurance than necessary to protect its interest in the property securing the mortgages.

108.     Acts constituting violations of TILA occurred within one year prior to the filing of the original Complaint in this action, or are subject to equitable tolling because Freedom's

kickbacks, reinsurance, and other unearned revenue-generating schemes were the subject of secret agreements among it and its affiliates and were concealed from borrowers.

109. The Ramnauth Plaintiffs and Class members have been injured and have suffered a monetary loss arising from Freedom's violations of TILA.

110. As a result of Freedom's TILA violations, the Ramnauth Plaintiffs and Class members are entitled to recover actual damages and a penalty of $500,000.00 or 1% of Freedom's net worth, as provided by 15 U.S.C. § 1640(a)(1)-(2).

111. The Ramnauth Plaintiffs and Class members are also entitled to recovery of attorneys' fees and costs to be paid by Freedom, as provided by 15 U.S.C. § 1640(a)(3).

**WHEREFORE**, the Ramnauth Plaintiffs, on behalf of themselves and all Class members similarly situated, seek a judgment in their favor against Freedom awarding actual damages and a penalty of $500,000.00 or 1% of Freedom's net worth, as provided by 15 U.S.C. §1640(a)(1)-(2), as well as of attorneys' fees and costs to be paid by Freedom, as provided by 15 U.S.C. § 1640(a)(3).

<u>**COUNT VI**</u>

<u>**Violation of RICO, 18 U.S.C. § 1962(c)**</u>
<u>**(the Ramnauth Plaintiffs against Freedom and ASIC)**</u>

112. The Ramnauth Plaintiffs incorporate paragraphs 1–71, herein as if fully set forth herein and further allege as follows.

113. At all relevant times, Freedom and ASIC were employed by and associated with an illegal enterprise, and conducted and participated in that enterprise's affairs, through a pattern of racketeering activity consisting of numerous and repeated uses of the interstate mails and wire communications to execute a scheme to defraud, all in violation of RICO, 18 U.S.C. § 1962(c).

114.    The RICO enterprise, which engaged in and the activities of which affected interstate and foreign commerce, was comprised of an association in fact of entities and individuals that included Freedom, its affiliates, and ASIC and their affiliates.

115.    The members of the RICO enterprise had a common purpose: to increase and maximize their revenues by forcing the Ramnauth Plaintiffs and Class members to pay inflated amounts for FPI through a scheme that allowed Defendants to charge borrowers more than Freedom's cost of coverage using kickbacks and expenses associated with servicing Freedom's entire loan portfolio to conceal from the Ramnauth Plaintiffs and Class members the true nature of the charges. Freedom and ASIC shared the bounty of their enterprise by sharing the illegal profits generated by the joint scheme.

116.    The RICO enterprise functioned over a period of years as a continuing unit and had a maintained an ascertainable structure separate and distinct from the pattern of racketeering activity.

117.    Freedom and ASIC conducted and participated in the affairs of this RICO enterprise through a pattern of racketeering activity that projects into the future, lasted more than one year, and that consisted of numerous and repeated violations of federal mail and wire fraud statutes, which prohibit the use of any interstate or foreign wire or mail facility for the purpose of executing a scheme to defraud, in violation of 18 U.S.C. §§ 1341 and 1343.

118.    Freedom and ASIC directed and controlled the enterprise as follows:

a.  ASIC specifically developed and implemented guidelines and standards for the timing and content of the cycle of deceptive letters sent to borrowers about force-placed insurance, to which Freedom agreed.

b.  ASIC drafted the language of the fraudulent letters and correspondence to borrowers that was specifically designed to deceive borrowers into believing that they were coming from Freedom. The letters fraudulently misrepresented the true nature of the "cost" of the insurance forced on their properties, and these letters were approved by Freedom.

c.  ASIC ran the day-to-day operations of the force-placed scheme by, *inter alia*, tracking Freedom's portfolio, mailing a cycle of form letters to borrowers notifying them that insurance coverage would be forced, and misrepresenting to borrowers both that they would be charged only the costs of coverage and that a Freedom affiliate would be paid as compensation for work performed.

d.  ASIC paid kickbacks to Freedom and its affiliates to maintain Defendants' exclusive relationship and keep their force-placed scheme moving forward.

e.  By directing, controlling, and creating an enterprise and arrangement by which Freedom would receive unearned kickbacks.

f.  By directing, controlling, and creating an enterprise and arrangement by which Freedom would receive illegitimate revenues (ultimately charged to borrowers) in the form of direct payments, debt forgiveness, expense reimbursements, or "commissions," that were merely bribes to keep the exclusive relationship in place and not disclosing same to borrowers.

g.  By directing, controlling, and creating an enterprise and program by which Freedom never charged the borrowers its actual or effective cost of the FPI policies.

h.  By directing, controlling, and creating an enterprise and program where ASIC took money directly from borrowers escrow accounts and took amounts which are not the actual or effective "cost" for lender placed insurance but instead, including illegal bribes and kickbacks.

i.  By designing and directing an exclusive arrangement by which Defendants manipulated the FPI market in order to artificially inflate the amounts they charge to borrowers for force-placed insurance. The charges were inflated to provide Freedom and its affiliates with kickbacks disguised as "commissions" or expense reimbursements, or to cover the cost of discounted mortgage servicing, and/or to provide Freedom with other forms of kickbacks. ASIC and its affiliates benefitted by securing business from Freedom—it provides kickbacks to it at the expense of the borrowers who are charged the inflated charges.

j.  By developing and implementing guidelines and criteria to determine when force-placed insurance is placed an a borrower's home, in what amount, for what coverages and for what period of time—all of which resulted in inferior and more expensive insurance that covered time periods where no claims were made or resulted in "double coverage."

k.  By developing and implementing an automated system to send the cycle of deceptive letters to borrowers, to determine the type, time period and amount of substandard and unnecessary coverage, and to remove or charge borrowers' escrow accounts automatically for improper and inflated charges.

119.     In order to further its control and direction of the enterprise, ASIC paid bribes and kickbacks to Freedom in the form of unearned commissions, direct payments, reinsurance premiums, expense reimbursements, and below-cost mortgage servicing functions.

120.     As part of and in furtherance of the scheme to defraud, Defendants made numerous material omissions and misrepresentations to the Ramnauth Plaintiffs and Class members with the intent to defraud and deceive them.

121.     For example, ASIC and its affiliates, with the approval of Freedom and on Freedom letterhead, sent the Ramnauth Plaintiffs FPI notices through the U.S. mail informing them that the cost of FPI would be higher than that of voluntary coverage "because the insurance we purchase is issued automatically without evaluating the risk of insuring your property." In fact, however, the inflated amounts charged to the Ramnauth Plaintiffs and the class were due to kickbacks and other impermissible costs provided to Freedom and included in the amounts charged to the Ramnauth Plaintiffs and the Class members. Freedom and ASIC had a duty to correct this mistaken impression.

122.     This misrepresentation was material, as it gave Freedom and ASIC a colorable reason to charge the Ramnauth Plaintiffs unreasonably inflated amounts for insurance and would have influenced the Ramnauth Plaintiffs' decisions whether to pay the charges or contest them. For example, if the Ramnauth Plaintiffs known that Freedom was effectively paying much less than what it charged to the Ramnauth Plaintiffs, then the Ramnauth Plaintiffs would not have paid or would have contested the charges for FPI. The Ramnauth Plaintiffs received and reviewed one such letter dated March 21, 2018 through the U.S. mail. Upon information and belief, the Ramnauth Plaintiffs received a number of similar letters from ASIC on Freedom letterhead.

123.    For the purpose of executing the scheme to defraud, Freedom and ASIC sent, mailed, and transmitted, or caused to be sent, mailed, or transmitted, in interstate or foreign commerce numerous materials, including but not limited to the notices and letters described above informing the Ramnauth Plaintiffs and Class members that they could charge the Ramnauth Plaintiffs and Class members unreasonably high amounts for FPI.

124.    This scheme to defraud proximately injured the Ramnauth Plaintiffs and the Class members because it prevented them from making an informed decision regarding whether to dispute or pay the force-placed charges, or whether to allow new coverage to be placed on their property. Had they known that the charges had been artificially inflated to include kickbacks and other improper charges, they would not have paid them or would have contested them. Freedom and ASIC also transferred sums among themselves, including but not limited to kickbacks, in furtherance of their scheme to defraud the Ramnauth Plaintiffs and Class members, in violation of the wire fraud statutes.

125.    By reason and as a result of Freedom and ASIC's conduct and participation in the racketeering activity alleged herein, these Defendants have caused damages to the Ramnauth Plaintiffs and Class members in the form of unreasonably high FPI premiums.

**WHEREFORE**, the Ramnauth Plaintiffs and Class members seek compensatory and treble damages, and attorneys' fees and costs, pursuant to 18 U.S.C. § 1964(c).

<u>**COUNT VII**</u>

<u>**Violation of RICO, 18 U.S.C. § 1962(d)**</u>
<u>**(the Ramnauth Plaintiffs against Freedom and ASIC)**</u>

126.    The Ramnauth Plaintiffs incorporate paragraphs 1–71 and 113-125, as if fully set forth herein and further allege as follows.

127.    At all relevant times, Freedom and ASIC were associated with the enterprise and agreed and conspired to violate 18 U.S.C. § 1962(d). These Defendants agreed to conduct and participate, directly and indirectly, in the conduct and affairs of the enterprise through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(d).

128.    Freedom and ASIC illegally agreed to violate RICO, 18 U.S.C. § 1962(d), by, inter *alia*:

   a.   Agreeing that ASIC and its affiliates would be Freedom's exclusive FPI provider and would extract unreasonably inflated amounts from Freedom's customers. Defendants also agreed that ASIC would pay kickbacks to Freedom or its affiliates.

   b.   Agreeing that ASIC would monitor Freedom's mortgage portfolios for lapses in voluntary insurance and would, with the approval of Freedom, send misleading notices to borrowers. These misleading notices would inform the borrowers that if new coverage were not procured, coverage would be forced, the borrower would be charged "the cost of the insurance" and earned "commissions" payments would be paid to a Freedom affiliate.

   c.   Entering into illusory commission or other agreements in order to disguise the true nature of the amounts charged to borrower under the guise of FPI.

   d.   Agreeing to commit two or more predicate acts as described above in Count VI.

129.    Upon information and belief, Freedom affiliates pass profits from this scheme to Freedom through credits in their general ledger accounts.

130.    Freedom and ASIC committed and caused to be committed a series of overt acts in furtherance of the conspiracy and to affect the objects thereof, including but not limited to the acts set forth above.

131.    As a result of these Defendants' violations of 18 U.S.C. § 1962(d), the Ramnauth Plaintiffs and Class members suffered damages in the form of unreasonably high FPI premiums.

**WHEREFORE,** the Ramnauth Plaintiffs and Class members seek compensatory and treble damages, and attorneys' fees and costs, pursuant to 18 U.S.C. § 1964(c).

## PRAYER FOR RELIEF

Mahase Ramnauth, Lisa N. Deosingh, and Kungbihari Ramkissoon, on behalf of themselves and all similarly situated individuals, demand judgment against Defendants as follows:

(1)     Declaring this action to be a proper class action maintainable pursuant to Rule 23(a) and Rule 23(b)(1) and (2), or Rule 23(b)(3) of the Federal Rules of Civil Procedure and declaring Plaintiffs and their counsel to be representatives of the Class;

(2)     Enjoining Defendants from continuing the acts and practices described above;

(3)     Awarding damages sustained by Plaintiffs and the Class members as a result of Freedom's breaches of the subject mortgage contracts and the implied covenant of good faith and fair dealing, together with pre-judgment interest;

(4)     Finding that Freedom has been unjustly enriched and requiring it to refund all unjust benefits to Plaintiffs and the Class, together with pre-judgment interest;

(5)     Awarding Plaintiffs and the Class costs and disbursements and reasonable allowances for the fees of Plaintiffs' and the Class's counsel and experts, and reimbursement of expenses;

(6)     Awarding actual damages and a penalty of $500,000 or 1% of Freedom's net worth as provided by 15 U.S.C. § 1640 (a)(1)-(2), and attorneys' fees and costs as provided by 15 U.S.C. § 1640 (a)(3)

(7)     Awarding actual and, where appropriate, punitive damages sustained by Plaintiffs and the Class as a result of ASIC's tortious interference;

(8)     Awarding compensatory and treble damages, and attorneys' fees and costs under the federal RICO statute; and

(9)     Awarding such other and further relief the Court deems just and equitable.

## DEMAND FOR JURY TRIAL

Plaintiffs and the Class request a jury trial for any and all Counts for which a trial by jury

is permitted by law.

Respectfully submitted this 27th day of November, 2018.

By: /s/ *Kyle Tognan, Esq.*

| | |
|---|---|
| Kyle Tognan, Esq. <br> ktognan@bathweg.com <br> **BATHGATE, WEGENER & WOLF, P.C.** <br> One Airport Road <br> P.O. Box 2043 <br> Lakewood, New Jersey 08701 <br> Phone: 732-363-0666 <br><br> *Counsel for Plaintiffs* | Adam M. Moskowitz, Esq. <br> adam@moskowitz-law.com <br> Howard M. Bushman, Esq. <br> howard@moskowitz-law.com <br> Joseph M. Kaye, Esq. <br> joseph@moskowitz-law.com <br> **THE MOSKOWITZ LAW FIRM, PLLC** <br> 2 Alhambra Plaza <br> Suite 601 <br> Coral Gables, FL 33134 <br> Telephone: (305) 740-1423 <br><br> *Counsel for Plaintiffs* <br> (*pro hac vice* forthcoming) |